IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 13, 2020

**STATE OF TENNESSEE v. JOHN CURTIS PERRY, SR., AND ASHLEY NICOLE HANKINS**

**Appeal from the Circuit Court for Stewart County
Nos. 81CC-2017-CR-155-D, 81CC-2017-CR-155-B   David D. Wolfe, Judge**

_____

**No. M2019-01311-CCA-R3-CD**

_____

The Defendants, John Curtis Perry, Sr., and Ashley Nicole Hankins, appeal their convictions for three counts of felony murder for which they were sentenced to life imprisonment.  On appeal, the Defendants, either individually or collectively, argue that: (1) the evidence is insufficient to support the convictions; (2) the trial court erred in granting and denying various requests to continue the trial; (3) the trial court erroneously admitted evidence of prior bad acts; (4) the trial court erred in limiting the cross-examination of a witness; (5) the trial court erred in excluding a co-defendant's statement; (6) the trial court erred in instructing the jury regarding the concealment and destruction of evidence; (7) the prosecutor made improper comments during rebuttal closing arguments; and (8) cumulative error warrants relief.  Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court. However, we remand for entry of corrected judgments reflecting merger of the felony murder convictions into one conviction for each of the Defendants.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;
Case Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Anthony L. Clark, Paris, Tennessee, for the appellant, John Curtis Perry, Sr.

Anthony W. Kirby, Jr. (on appeal); and Kenneth Merriweather (at trial), Clarksville, Tennessee, for the appellant, Ashley Nicole Hankins.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Joshua

Turnbow and Joseph C. Hall, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

During the early morning hours of June 7, 2016, the victim, Mr. Donnie Cooksey, was shot and killed in his home in Cumberland City, Tennessee, during a robbery. As a result, the Defendants and their co-defendants, Gerald Lovelace, Abdullah Hassan Powell, and Amy Brooke Hankins, were charged with felony murder during the perpetration of or attempt to perpetrate robbery, felony murder during the perpetration of or attempt to perpetrate burglary, and felony murder during the perpetration of or attempt to perpetrate theft. The Defendants and their co-defendants were also charged with aggravated burglary of another victim's home that occurred on June 5, 2016. The trial court severed the Defendants' trials from the co-defendants' trials and severed the felony murder charges from the aggravated burglary charge. The Defendants proceeded to trial on the felony murder charges.

### The State's Proof

The State presented evidence at trial that Ms. Ashley Hankins, the girlfriend of one of the victim's brothers, persuaded others to rob the victim, who sold drugs from his home. Mr. Perry drove Mr. Lovelace and Mr. Powell to the area of the victim's home. Mr. Perry waited in his truck while Mr. Lovelace and Mr. Powell entered the victim's home and shot the victim while attempting to rob him. The victim died as a result of his injuries.

The victim was last seen alive on the night of June 6 and early morning hours of June 7, 2016, when a friend, Ms. Samantha Kizer, visited him at his home. Ms. Kizer testified that she left the victim's home around midnight, that she received a text message from him at around 1:30 a.m., and that she did not hear from the victim again. At around 2:00 a.m., Ms. Anita Stephens, who was staying at her mother's home located across the street from the victim's home, woke up to her dog barking outside of her window, which was within view of the victim's front door. Ms. Stevens testified that she then heard a loud "popping" noise, which she believed to be a car backfiring. She looked outside but did not see anything. Between 7:45 a.m. and 8:00 a.m. on June 7th, Ms. Georgia Cooksey, the victim's sister-in-law, drove by his house and saw that his front door was open. She testified that she found this to be unusual because the victim generally did not get up in the mornings until 9:00 or 9:30 a.m.

- 2 -

Ms. Brandy Burns, who was involved in a relationship with the victim for several years up until his death, testified that the victim sold marijuana and occasionally cocaine to a customer base of five or six people and would not sell drugs to just anyone who wished to purchase them. He stored the drugs in his kitchen cupboards, his recliner, and his bedroom. Ms. Burns stated that she visited the victim on the weekend prior to his death and that he had approximately $3,000 in cash, which he planned to use as a down payment on a house.

Multiple members of the victim's family called the victim on June 7th, but the victim did not answer their calls. As a result, Mr. Troy Cooksey, one of the victim's brothers, went to the victim's home around 2:00 p.m. The victim's front door was slightly open, and the storm door was closed. Mr. Troy Cooksey knocked on the front door and called the victim's name, but the victim did not come to the door. Mr. Troy Cooksey looked inside through the storm door and saw the victim lying on the living room floor.

Mr. Troy Cooksey testified that he entered the home and unsuccessfully attempted to awaken the victim. Because he did not have cellular service inside the victim's home, he exited the home and asked a neighbor to call 911. When he returned to the victim, he saw that the victim had a gunshot wound to the chest and that the victim's gun was lying beside him. Mr. Troy Cooksey observed blood in the living room leading down the hallway. He believed the victim was wearing shorts and a t-shirt, which he described as "bed clothes." Ms. Georgia Cooksey testified that the victim, generally, would not come to the door while wearing such clothing. Mr. Troy Cooksey acknowledged taking marijuana that the victim had rolled up in five cigarillos from the home.

Officer Rick Smith of the Cumberland City Police Department responded to the scene. He entered the home through the front door and saw the victim lying on the living room floor with his head close to a wall adjacent to a hallway. The victim was wearing a t-shirt, socks, and underwear, and stains consistent with blood were on his shirt, his legs, the floor, and on the top and side of a red chair sitting upright by the door. Officer Smith checked the victim for a pulse and called for an EMS unit. Mr. Edward Wood, a paramedic, responded to the scene and found that the victim had no vital signs. Mr. Wood observed a gunshot entrance wound to the left side of the victim's upper chest.

Special Agent Kevin Warner, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), also responded to the scene. Upon entering the home, he observed reddish brown stains on the top and side of a red chair in the living room, and he testified that the stain appeared to have begun on the top of the chair and run down the side. Drops consistent with blood were on the floor in the living room near the victim and on

the floor in the hallway leading away from the victim to outside of the victim's bedroom. A pistol was on the living room floor next to the victim. A fired cartridge casing and what appeared to be blood drops were on the carpet next to the bed in the bedroom, and reddish-brown stains consistent with blood were on the bedding. On cross-examination, Special Agent Warner testified that although the front door was open, the dead bolt was extended, and the area of the door where the dead bolt had been was damaged. The items recovered from the home included plant material in a bag in the bedroom and in a jar in a kitchen cabinet, and Special Agent Warner also found four cell phones in the home.

Ms. Amanda Blake, a friend of Ms. Ashley Hankins, testified that around the time of the victim's death, Ms. Ashley Hankins was in a relationship with both Mr. Chris Cooksey, who was the victim's brother, and Mr. Powell, to whom she referred as "D." Ms. Blake stated that in March or April of 2016 while at her home, Ms. Ashley Hankins asked Ms. Blake's brother, Mr. Johnny Blake, to rob the victim. Ms. Ashley Hankins described the victim's home and told Mr. Blake that he would need to have a gun with him because the victim owned guns. Ms. Ashley Hankins instructed Mr. Blake to take a black box containing money from the home. Ms. Blake stated that she interrupted Ms. Ashley Hankins and told her to not ask Mr. Blake to commit a robbery. Ms. Blake told Ms. Ashley Hankins that if she wanted the victim to be robbed, she should do it herself.

Ms. Blake testified that on June 6th, she was in her car with Ms. Ashley Hankins, Ms. Amy Hankins, and Ms. Angela Sweeney as Ms. Ashley Hankins was laughing and stating that "they had gotten the wrong house and that she had to show them … 'stupid N. words' the right house." Ms. Blake did not know that Ms. Ashley Hankins was referring to the victim's home until the following day.

On cross-examination, Ms. Blake acknowledged that she had a prior theft conviction. She stated that when Ms. Ashley Hankins was speaking to Mr. Blake, she did not refer to the victim by name but just described his house. Ms. Blake recalled that at one point, Ms. Ashley Hankins and Mr. Blake went outside together.

Mr. Johnny Blake testified that in April of 2016, while at Ms. Blake's home, Ms. Ashley Hankins asked him to burglarize a home in Cumberland City and told him that a large amount of money was possibly in the home. Ms. Ashley Hankins told him that he would need to be armed because the owner of the home may carry a gun. Mr. Blake refused to commit the burglary. Mr. Blake stated that Ms. Ashley Hankins did not tell him who owned the home and that he did not know the identity of the owner until after the victim was killed. A few minutes after the conversation, Mr. Blake and Ms. Ashley Hankins went outside where she again asked him to commit the burglary, and he declined. On cross-examination, Mr. Blake acknowledged that at the time of trial, he was on probation for a theft conviction.

Ms. Angela Sweeney testified that while she was inside a vehicle with Ms. Ashley Hankins and Ms. Blake, Ms. Ashley Hankins said, "The fools hit the wrong house, I'm going to have to show them the right one." Ms. Sweeney did not realize about what Ms. Ashley Hankins was referring until after the victim's death. Ms. Sweeney recalled another conversation with Ms. Blake, Ms. Ashley Hankins, and Ms. Amy Hankins during which Ms. Ashley Hankins and Ms. Amy Hankins were laughing about "them hitting the wrong house." On cross-examination, Ms. Sweeney testified that the first conversation occurred a couple of weeks prior to the victim's death and that the second conversation occurred a few days or weeks after the first conversation.

Mrs. Jessie Bell, who was in custody at the time of trial due to her failure to attend a prior court hearing in accordance with a subpoena, testified that she had known Ms. Ashley Hankins for seven or eight years and that they used drugs together. Mrs. Bell also knew Ms. Amy Hankins, Mr. Lovelace, and Mr. Powell, whom she only knew as "D." Ms. Amy Hankins and Mr. Lovelace were in a relationship, and Mr. Lovelace was a friend of Mrs. Bell's husband, Mr. Lamaro Bell. Mrs. Bell recalled that Ms. Ashley Hankins asked Mr. Bell and one of his friends to rob the victim and that she asked Mrs. Bell to do so a few days later. Ms. Ashley Hankins was angry at the victim for being "greedy" and said they would be able to get money, cocaine, and marijuana from the victim's home.

Mrs. Bell testified that a few days after their conversation, Ms. Ashley Hankins told her that the victim had been killed. Police officers had released a video recording of a nearby parking lot showing two people entering a truck in an effort to obtain information regarding their identities. Ms. Ashley Hankins showed Mrs. Bell the video and asked her whether she could identify anyone, and Mrs. Bell recognized Mr. Lovelace as one of the people in the video. She stated that Ms. Ashley Hankins was not upset that the victim had died but was upset that the intruders did not take anything out of the home. Ms. Ashley Hankins told Mrs. Bell that the victim was not supposed to be in the home and that the intruders were afraid, shot the victim, and left without searching the home.

Mrs. Bell stated that sometime after the victim's death, Ms. Ashley Hankins offered to trade her a black handgun for drugs and that Mrs. Bell refused. Once officers began coming to Mrs. Bell's home to talk to her, she called Ms. Ashley Hankins, who instructed her not to provide the officers with any information.

On cross-examination, Mrs. Bell testified that she had a prior theft conviction. She acknowledged that although she testified at trial that Ms. Ashley Hankins solicited her a few days before the victim's death, Mrs. Bell testified during a preliminary hearing

that the solicitation occurred three weeks to one month prior to his death. She explained that she had difficulty in keeping up with dates.

On redirect examination, Mrs. Bell testified that she also recognized from the video "D" and Mr. Perry, whom she met shortly before the victim's death. She stated that Mr. Perry drove a white truck similar to the truck in the video.

Ms. Tiffany Miller, Mr. Perry's former girlfriend, testified that during the summer of 2016, while living with Mr. Perry, she overheard a telephone conversation between Mr. Perry and Mr. Powell during which Mr. Powell asked Mr. Perry to commit a robbery. Ms. Miller begged Mr. Perry not to do it. Later, following an argument, Mr. Perry left their apartment and did not return until the following morning. Ms. Miller stated that once he returned, he denied that anything had occurred even though his behavior indicated otherwise. Ms. Miller also stated that at some point, Mr. Perry said he did not want to tell her "anything" because he did not want her to get in trouble. On cross-examination, Ms. Miller testified that the telephone conversation occurred sometime between May and August of 2016. She clarified that she did not hear Mr. Powell's portion of the telephone conversation but that Mr. Perry later told her that Mr. Powell wanted Mr. Perry to drive him to rob someone. A few days after the telephone conversation, Mr. Perry left the apartment and was shaken when he returned the following morning.

Ms. Amy Hankins, a co-defendant in the case, testified that she had pled guilty to facilitation of the second degree murder of the victim and had received a sentence of eight years at thirty percent. As part of her plea agreement, she agreed to testify against the other defendants. Ms. Amy Hankins stated that she and her sister, Ms. Ashley Hankins, were addicted to drugs and that at the time of the offense, Ms. Amy Hankins was in a relationship with Mr. Lovelace, who also was addicted to drugs. Mr. Powell and Mr. Lovelace were friends, and Ms. Ashley Hankins was involved in a romantic relationship with Mr. Powell. Ms. Amy Hankins knew the victim through Ms. Ashley Hankins.

Ms. Amy Hankins testified that in March or April of 2016, Ms. Ashley Hankins asked her and Mr. Lovelace whether they would be interested in robbing the victim, and Ms. Amy Hankins and Mr. Lovelace declined. However, Ms. Ashley Hankins was persistent and had asked multiple people to participate. Ms. Amy Hankins stated that because they needed money for rent, Mr. Lovelace agree to participate in the robbery.

Ms. Amy Hankins recalled that on June 6, 2016, she, Ms. Ashley Hankins, Ms. Sweeney, and Ms. Blake were in Ms. Blake's car in Clarksville because Ms. Amy Hankins had to be in court and Ms. Ashley Hankins had a doctor's appointment. While

in the car, Ms. Ashley Hankins asked Ms. Amy Hankins when the robbery would occur, and Ms. Amy Hankins replied that it would occur that night. Ms. Amy Hankins later was dropped off at Mr. Powell's home where Mr. Lovelace was waiting with the children of Mr. Lovelace and Ms. Amy Hankins.

Later that evening once it was dark outside, Mr. Perry and another man arrived at Mr. Powell's home. Mr. Perry was driving a white truck, and the other man was driving a black Pontiac Grand Am. The man in the black car drove Ms. Amy Hankins, Mr. Lovelace, and their children to their home in Dover, Tennessee, while Mr. Perry and Mr. Powell followed them in Mr. Powell's truck. The man dropped them off at their home and left. Ms. Amy Hankins stated that at around 11:30 p.m. or midnight, Mr. Lovelace changed into black clothing and that he, Mr. Powell, and Mr. Perry prepared to leave for the robbery. She said that Mr. Lovelace and Mr. Powell both had black, semi-automatic pistols that they hid underneath the hood of Mr. Perry's truck. Ms. Amy Hankins previously had seen Mr. Lovelace hide a pistol underneath the hood and on top of the air filter of a vehicle. Mr. Lovelace, Mr. Powell, and Mr. Perry left together in Mr. Perry's truck. Mr. Lovelace called Ms. Amy Hankins around 2:30 or 3:00 a.m. but did not return home until the "next afternoon."

Ms. Amy Hankins testified that while she did not go to the victim's home to assist in the robbery, she knew that the robbery was going to occur and did not try to stop it. She maintained that the robbery was Ms. Ashley Hankins's idea. Ms. Amy Hankins called Ms. Ashley Hankins on the following morning and told her to check on the victim, but Ms. Ashley Hankins refused. At approximately 3:30 p.m., Ms. Ashley Hankins called Ms. Amy Hankins and told her that the victim had died. Ms. Ashley Hankins later told her sister that she did not feel bad about the victim's death.

On cross-examination, Ms. Amy Hankins agreed that she gave three prior statements to law enforcement during which she denied that she, Mr. Lovelace, and Ms. Ashley Hankins were involved in the victim's death. During one of the interviews, she told officers that Mr. Lovelace was at home with her on the night of the victim's death. She acknowledged she may have also told officers that the victim's death was gang-related. She recalled that during one interview, she told the officers that she did not know Mr. Perry before the officers actually mentioned his name, and she knew this statement implicated her in the crime. She also told officers that Mr. Lovelace did not own a gun and that she had never seen Mr. Powell with a gun. She agreed that she lied to the officers.

Ms. Amy Hankins testified that she and Mr. Lovelace had purchased marijuana from the victim at his home on multiple occasions and that she also had purchased cocaine from the victim. She said she first met Mr. Perry on the night of the offense. She

agreed that she previously had stated that Mr. Lovelace, Mr. Powell, and Mr. Perry left her home "suited and booted," which means that "[j]ust dark clothes, guns, ready to go." She did not recall what Mr. Perry was wearing.

Ms. Amy Hankins acknowledged having four prior theft convictions. She denied that she was guilty of felony murder. She maintained that she did not set up the robbery but that she knew that it was to occur, that she was to receive some of the proceeds of the robbery, and that she did not take any action to stop the robbery. She denied "begging" the prosecutor for a plea deal. She explained that her attorney met with her and stated that the prosecutor had offered a plea deal in exchange for her testimony. Ms. Amy Hankins agreed that in order to keep her plea deal in place, her testimony at trial must be similar to her statements during her proffer made prior to the plea hearing. On redirect examination, Ms. Amy Hankins agreed that the district attorney general, an assistant district attorney general, and her attorneys were present when she made a proffer statement to law enforcement officers. She denied that any of them coached her, threatened her, or otherwise told her what to say.

Dr. Erin Carney, a forensic pathologist, performed the autopsy of the victim. She testified that the victim sustained a gunshot wound to the left side of his upper chest. She did not observe any soot or gun powder stippling on the victim's skin or clothing, which would indicate that the gun was discharged at a close range. The victim did not have any defensive wounds. The bullet broke one of the victim's left ribs and traveled through the left lung, the left side of the heart, the diaphragm, the stomach, and the left kidney. The bullet was recovered in the muscle on top of the left iliac bone, which is part of the hip. Dr. Carney determined that the cause of the victim's death was the gunshot wound to the chest and that the manner of his death was homicide.

Dr. Carney testified that the victim had a large amount of internal bleeding and that it would have taken several minutes before he lost consciousness and died. She agreed that if the victim were shot in one room of his house, he could have walked or could have crawled to another area of the home before dying. She stated that because the bullet entered at an angle and traveled downward, the gun had to be over the victim when he was shot. She agreed that the victim possibly was sitting on his bed and leaned over when someone stood up and shot him.

TBI Special Agent Shaun Adkins, the lead agent in the case, testified that based upon the cartridge casing found in the bedroom, the blood on the bed coverings, and the location of the gunshot wound, officers determined that the victim was sitting on the foot of the bed when he was shot. Special Agent Adkins noted that blood droplets were in the hallway and that aspirated blood, which generally results from someone coughing up blood, was on the side of the wall about knee level. He also noted that the blood

continued into the living room and was on a red chair at the end of the hallway. Special Agent Adkins believed that the victim managed to support himself on the chair as blood ran down the chair's side before he collapsed on the floor.

Special Agent Adkins testified that he did not observe any signs of forced entry. He noted that the front interior door was open and that the dead bolt lock was extended in the locked position. He stated that while there were tool marks on the door and on the side of the doorframe, those tool marks did not appear to be recent. The murder weapon was not recovered from the crime scene. Officers collected the victim's wallet, marijuana, three cell phones, a Samsung tablet, $1,250 in cash from a bag in the bedroom, a grinder for grinding marijuana, a scale, a plastic container with cocaine, and prescription pills. The victim's car, a Lexus, was parked at the home.

Officers obtained a video recording from an apartment complex that overlooked the victim's residence. The recording depicted a white truck with three African-American men in and around the truck. Law enforcement released the recording to the media in an effort to generate leads. Special Agent Adkins testified about the video as it was played for the jury. He noted that the timer for the recorder was off by one hour and fifteen minutes and that the actual time depicted in the video was 1:51 a.m. The exhibit included two different videos where the cameras were directed at the back of the truck. One of the videos depicted the back left side and the driver's side of the truck, and the other video depicted the back right side and passenger's side of the truck.

During the first ten to fifteen minutes of the video of the driver's side, the truck was parked, and then an African-American man exited the driver's side of the truck, walked to the front of the truck, raised the hood, stood behind the raised hood for a period of time, closed the hood, and reentered the truck on the driver's side. Special Agent Adkins testified that he was unable to see anyone in the video in possession of a bottle of motor oil. The truck remained in the parking lot approximately twenty-five minutes before the driver drove away.

The video depicting the passenger's side of the truck showed two African-American men walk up to the truck and enter through the passenger side at around 2:03 a.m. The video showed the hood of the truck being raised and one of the passengers exiting the truck and approaching the front of the truck and behind the raised hood. Once the hood was closed, the passenger reentered the truck. At 2:10 a.m., the two passengers exited the truck and walked toward the front of the truck, and the truck backed up and drove away a short time later.

Special Agent Adkins interviewed Ms. Ashley Hankins on three occasions. The first two interviews were non-custodial, and officers advised her of her rights during the

last interview. A video recording of one of the interviews was played at trial. During the interview, Ms. Ashley Hankins denied shooting the victim and maintained that she did not know who did. She stated that the victim may have been killed by a competitor or due to "a jealousy thing." She denied setting the victim up and maintained that there was no reason to do so because the victim would have given her money if she needed it. She also denied recognizing the truck or anyone depicted in the video.

Ms. Ashley Hankins said that about two weeks prior to the victim's death, she was at Ms. Amy Hankins's home when she overheard Mr. Lovelace talking on his telephone about committing robberies. Ms. Ashley Hankins stated that she did not believe Mr. Lovelace killed the victim because Mr. Lovelace did not know the victim and the victim would not have allowed someone whom he did not know to enter his home. She also stated that she had never seen Mr. Lovelace with a gun. She denied that Ms. Amy Hankins could have set up the robbery. Special Agent Adkins testified that while Ms. Ashley Hankins cried during the interview, he did not believe she was upset about the victim's death but was upset about the situation in which she found herself.

In the video, Ms. Ashley Hankins stated that after previously speaking to officers about the victim's death, she went to her sister's house and asked questions about the victim. Mr. Lovelace was at the house, began acting strange, and said she was no longer welcome in their home. Ms. Ashley Hankins said that a short time later, she received a call from "Greg," from whom she previously purchased pills in Clarksville. Greg told her that "D" had discussed planning to sell pills mixed with fentanyl to her in an attempt to kill her. Ms. Ashley Hankins denied ever meeting "D" or knowing his real name. She said that "D" was a friend of Mr. Lovelace and that she learned through her sister that "D" was a tall, skinny African-American man.

Ms. Ashley Hankins denied ever owning or possessing a gun and denied attempting to dispose of a gun in Clarksville. She acknowledged that she may have sold a gun on the streets a few years prior to the interview. She then stated that she traded a black, automatic handgun for pills with "LeAnn," who was at Greg's house. Ms. Ashley Hankins told the officers that she stole the gun from "Fred," who was also known as "Mississippi" and was a drug dealer in Clarksville. Ms. Ashley Hankins stated that "LeAnn" was supposed to hold the gun until Ms. Ashley Hankins could bring her money to pay for the pills but that "LeAnn" sold the gun instead.

Special Agent Adkins interviewed Mr. Perry twice, and one of the interviews, which occurred in March of 2017, was video recorded and played for the jury at trial. When officers arrived at Mr. Perry's home, he had the same truck that was depicted in the video from the night of the victim's death. Once the officers and Mr. Perry entered the interview room and before the officers advised Mr. Perry of his rights, Mr. Perry stated,

"You better Mirandize me, because if you don't I'm going to use it against you." The officers then advised Mr. Perry of his rights, and Mr. Perry waived his rights and agreed to speak to them.

Mr. Perry told Special Agent Adkins that he was willing to make a deal that would involve ensuring that his family was financially secure. Mr. Perry stated that he was not requesting "millions or hundreds of thousands." He further stated that "I'm not even asking for ten" but that "ten would be a great number." Special Agent Adkins believed Mr. Perry was referring to $10,000. Special Agent Adkins testified that he and the other officer were taken aback because interviewees typically do not request payment in exchange for information, and he denied offering to pay Mr. Perry.

Mr. Perry acknowledged that his truck was the truck depicted in the video recording taken during the early morning hours of the victim's murder and that he was shown as the driver in the video. He stated that he knew "G," who was identified at trial as Mr. Lovelace, through a pain management class, but Mr. Perry denied knowing "G's" real name. Mr. Perry referred to Mr. Powell as "D" and said that although he had seen "D" around, he had never met him previously. Special Agent Adkins testified, however, that he received information indicating that Mr. Perry and Mr. Powell had known each other since they were in middle school.

Mr. Perry stated that he met Mr. Lovelace and Mr. Powell at the pain management clinic in Clarksville prior to the victim's death and that the two men told him that they knew someone in Cumberland City who would sell marijuana to them. They planned to purchase 3.5 ounces of marijuana for $60 and told Mr. Perry that they would share the marijuana with him and give him $20 for gas if he would drive them to the location. Mr. Perry said he agreed to do so. He stated that once they arrived in Cumberland City, Mr. Powell and Mr. Lovelace directed him to the parking lot of the apartment complex depicted in the video. The men told Mr. Perry that they were going to walk down the street to purchase marijuana, and Mr. Perry waited in his truck twenty to thirty minutes for them to return. Mr. Perry recalled that at one point, he got out of his truck and raised the hood to check the oil. He noted that he had a small amount of oil left in the truck and that he added some additional oil. He believed one of the men got out with him, but Mr. Perry denied handing the man anything while they were concealed by the truck's open hood. Mr. Perry stated that once he saw the two men walking down the street, he drove out of the parking lot to pick them up. He maintained that the men were walking at a normal pace, were not out of breath, and appeared as if nothing was wrong. Mr. Perry drove the men back to Clarksville and dropped them off at a hotel.

Mr. Perry denied knowing whether either of the men possessed weapons but stated that he had previously seen Mr. Powell with a gun in his waistband. Mr. Perry stated that

although he owned a gun at the time, he did not have the gun with him that night. He said the gun was stolen out of his truck sometime after the victim's death, and Special Agent Adkins was able to locate the police report regarding the stolen gun with the Clarksville Police Department.

Toward the end of the interview, Special Agent Adkins showed Mr. Perry a photographic array that included Mr. Powell's photograph and asked Mr. Perry whether he recognized the person to whom he referred as "D" in the array. Mr. Perry stated that although he recognized "D" in the array, he did not want to identify him without the presence of an attorney and without a deal in place. Special Agent Adkins testified that Mr. Perry was essentially saying "that's going to cost you." Special Agent Adkins stated that once they were outside of the interview room and away from the view of the camera, Mr. Perry identified Mr. Powell as "D" in the array.

On cross-examination, Special Agent Adkins testified that he believed Mr. Powell and Mr. Lovelace entered the victim's home and killed him. Mr. Powell, Mr. Lovelace, and Ms. Amy Hankins were charged with first degree murder. Special Agent Adkins did not believe that he asked Mr. Perry or Mr. Lovelace about Ms. Ashley Hankins's involvement in the case even though he had information at that time of their interviews that she was involved in setting up the robbery. Special Agent Adkins did not recall Mr. Blake's mentioning his conversation with Ms. Ashley Hankins that occurred inside Ms. Blake's home when he interviewed Mr. Blake.

Special Agent Adkins did not recall any witness who stated that Mr. Perry knew of the plan to commit a robbery before driving the two men to the apartment complex or what had occurred once he left the apartment complex. On redirect examination, Special Agent Adkins acknowledged that Ms. Miller stated that she overheard Mr. Perry on the telephone, after which he told her that the call was "about hitting a lick to get some money." Special Agent Adkins stated that the drive from the pain clinic in Clarksville to Cumberland City was a thirty- to forty-minute drive. He did not believe that Mr. Perry and the two men would travel such a distance in the middle of the night in order to purchase three ounces or grams of marijuana, which amounted to "less than a handful" of marijuana, when the men could have easily purchased such an amount in numerous places in Clarksville. Special Agent Adkins also did not believe that Mr. Perry was putting oil in the truck when the hood was up in the video. On recross examination, Special Agent Adkins acknowledged that he could not see what Mr. Perry was doing when the hood of his truck was up, and Special Agent Adkins did not know whether Mr. Perry checked the oil dipstick in the truck.

TBI Special Agent Lela Jackson, an expert in forensic chemistry, analyzed various drugs recovered from the home, which included 84.76 grams of marijuana, 21.6 grams of

marijuana, .18 grams of cocaine, and three tablets of Diazepam, a prescription drug. Another package contained 459.24 grams of plant material, but Special Agent Jackson did not analyze the material to determine if it was marijuana.

TBI Special Agent Shelly Betts, who was accepted by the trial court as an expert in firearm and tool mark examinations, testified that she examined bullet fragments removed from the victim's body, a Federal brand nine-millimeter cartridge casing recovered from the bedroom floor, and a Hi Point .380 auto-caliber pistol recovered from the living room floor. The bullet fragments were consistent with a nine-millimeter bullet. Special Agent Betts determined that the bullets fragments and the cartridge casing were not fired from the pistol. She also examined another firearm, which she excluded as firing the bullet fragments or the cartridge casing.

TBI Special Agent Lisa Burgee, who was accepted by the trial court as an expert in the area of forensic biology, testified that she determined that the victim's blood was on the slide of the pistol recovered from the living room, on the floor in the living room and the hallway, and in the bedroom. Special Agent Burgee also tested various areas of Mr. Perry's truck. Presumptive tests indicated the presence of blood on the middle seatbelt, but the stain could not be "localized," which meant that she could not find another positive result when she attempted to determine the location of the blood on the seatbelt. Special Agent Burgee noted various areas of the truck and a cigarette butt inside the truck where she found Ms. Miller's DNA. She obtained a DNA profile from another cigarette from inside the truck that was a mixture of at least two individuals with the major contributor matching the DNA of Mr. Perry.

TBI Special Agent Lucas Riley, who was accepted by the trial court as an expert in the field of latent prints, testified that he went to the scene where he dusted the entryway door for fingerprints. He was able to lift one fingerprint, but he was unable to identify to whom the fingerprint belonged. He was able to lift two latent fingerprints belonging to Mr. Perry from a soda bottle inside of the truck.

TBI Special Agent Miranda Gaddes, a forensic scientist who was accepted by the trial court as an expert in microanalysis, testified that she compared a partial tire impression found at the crime scene with photographs of the tires of the vehicles that were parked at the scene and determined that they did not match. Special Agent Gaddes stated that she searched tread design guidebooks to determine the type of tire that made the partial tire impression and determined that the impression was consistent with a Falkin Sincera SNA828 tire or another tire with the same tire design. She later compared the partial tire impression to the tires from Mr. Perry's Chevrolet truck and determined that they did not match. She agreed that if the tires on the truck had been changed, she would unable to determine if the original tires matched the impression.

**The Defense Proof**

Counsel for Ms. Ashley Hankins recalled Ms. Amy Hankins, who testified that she came into contact with Ms. Candice Butler while incarcerated in the Montgomery County Jail but denied discussing the case with her. Ms. Amy Hankins stated that Ms. Butler knew Ms. Ashley Hankins and told Ms. Amy Hankins information that had been provided to her by Ms. Ashley Hankins. Ms. Amy Hankins denied informing Ms. Butler of the State's plea offer, explaining that she had not yet received the offer when she was incarcerated with Ms. Butler. Ms. Amy Hankins testified that she provided the proffered statement on August 21, 2018, and that her plea hearing was on September 7th.

Ms. Candice Butler testified that at the time of trial, she was incarcerated in the Stewart County Jail for a charge of violating her probation and that from May 28 through August 14, 2018, she was incarcerated in the Montgomery County Jail on a methamphetamine charge. She stated that she and Ms. Amy Hankins were housed in the same pod for about one and one-half months, during which time Ms. Amy Hankins spoke to her about the case. Ms. Butler testified that the day before she was transferred to the Stewart County Jail, Ms. Amy Hankins returned from court and stated that she had been offered a plea deal with an eight-year sentence and that she would be required to testify. According to Ms. Butler, Ms. Amy Hankins told her that she would lie or say anything necessary in order to receive a favorable deal. On cross-examination, Ms. Butler testified that she believed she had this conversation with Ms. Amy Hankins on August 13, 2018. Ms. Butler acknowledged having prior multiple theft convictions.

Mr. Perry did not present any additional proof. At the conclusion of the proof, the jury returned verdicts convicting both of the Defendants of felony murder during the perpetration of robbery, felony murder during the perpetration of aggravated burglary, and felony murder during the perpetration of theft.[1] The trial court imposed sentences of life imprisonment for each of the convictions. The Defendants filed motions for a new trial, which were denied by the trial court following separate hearings. They each filed timely notices of appeal, and this court entered an order consolidating their appeals.

On appeal, the Defendants, either individually or collectively, argue that: (1) the evidence is insufficient to support the convictions; (2) the trial court erred in granting and denying various requests to continue the trial; (3) the trial court erroneously admitted

---

[1] The indictment charged the Defendants with felony murder during the perpetration of or attempt to perpetrate robbery, felony murder during the perpetration of or attempt to perpetrate burglary, and felony murder during the perpetration or of attempt to perpetrate theft. The trial court instructed the jury on and the jury returned verdicts for felony murder during the perpetration of robbery, felony murder during the perpetration of aggravated burglary, and felony murder during the perpetration of theft.

- 14 -

evidence of prior bad acts; (4) the trial court erred in limiting the cross-examination of Mrs. Bell; (5) the trial court erred in excluding Mr. Lovelace's statement; (6) the trial court erred in instructing the jury regarding the concealment and destruction of evidence; (7) the prosecutor made multiple improper comments during rebuttal closing argument; and (8) cumulative error warrants relief.

## ANALYSIS

### I. Jurisdiction

As an initial matter, Mr. Perry contends that this court does not have jurisdiction over the appeal because the separate aggravated burglary charge is still pending. He asserts that this court should remand the case to the trial court for a final disposition on the aggravated burglary charge. The State responds that this appeal is properly before this court because the trial court severed the aggravated burglary charge from the felony murder charges prior to trial. We agree with the State.

This appeal comes to this court as an appeal as of right pursuant to Tennessee Rule of Appellate Procedure 3(b). A defendant in a criminal case has the right to appeal from a "final judgment of conviction." *State v. Comer*, 278 S.W.3d 758, 760-61 (Tenn. Crim. App. 2008) (quotation omitted); *see* Tenn. R. App. P. 3(b). A judgment is deemed final "'when it decides and disposes of the whole merits of the case leaving nothing for the further judgment of the court.'" *Comer*, 278 S.W.3d at 761 (quoting *Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 460 (Tenn. 1995)). "[A] judgment is final if it decides the controversy between the parties on the merit and fixes their rights so that, if the judgment is affirmed, nothing remains for the trial court to do but to proceed with its execution." *Id.* (quotation omitted).

The record reflects that Ms. Ashley Hankins filed a motion to sever the aggravated burglary charge, which was committed against a different victim, from the felony murder charges. The trial court entered an "agreed order" granting the motion, and the order was signed by the prosecutor and Ms. Ashley Hankins's counsel. Mr. Perry did not challenge the severance in the trial court and does not challenge it on appeal. By severing the offenses, the trial court essentially created two separate cases, one involving the felony murder charges and the second involving the aggravated burglary charge. While Mr. Perry contends that this court does not have jurisdiction over the appeal of the felony murder convictions until after the aggravated burglary charge is resolved, he cites to no authority depriving this court of jurisdiction over a conviction of a severed offense until the remaining severed charges are resolved. We likewise find no such authority. Rather,

- 15 -

we conclude that the judgments for the felony murder convictions constitute final judgments over which we have jurisdiction.[2]

## II. Sufficiency

Mr. Perry challenges the sufficiency of the felony murder convictions. He argues that the evidence failed to sufficiently corroborate the accomplice testimony of Ms. Amy Hankins. He also argues that the evidence failed to establish that he had the requisite intent to commit robbery, burglary, or theft. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As it relates to the present case, felony murder is the killing of another committed during the perpetration of "any … robbery, burglary, [or] theft." T.C.A. § 39-13-202(a)(2). The only culpable mental state required of felony murder is "the intent to

---

[2] The State notes in its brief that the Assistant Attorney General spoke to the prosecutor, who stated that the aggravated burglary charge was dismissed. However, a judgment reflecting the dismissal is not included in the appellate record.

commit the enumerated offenses." T.C.A. § 39-13-202(b). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). A person commits aggravated burglary when, without the effective consent of the property owner, he enters a habitation with the intent to commit a felony, theft, or assault. T.C.A. §§ 39-14-402(a)(1), -403(a). Theft occurs when a person, "with intent to deprive the owner of property, … knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a).

## A. Accomplice Testimony

A criminal defendant in Tennessee cannot be convicted "solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citing *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *superseded by statute as stated in State v. Odom*, 137 S.W.3d 572, 583 (Tenn. 2004); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013)). "An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). The general test of whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Ms. Amy Hankins was indicted for the same offenses charged against the Defendants and, therefore, qualified as an accomplice.

Our supreme court has stated that in order to properly corroborate accomplice testimony,

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

*Shaw*, 37 S.W.3d at 903 (quoting *Bigbee*, 885 S.W.2d at 803). The corroborating evidence need only be "slight." *State v. Griffs*, 964 S.W.2d 577, 589 (Tenn. Crim. App.

- 17 -

1997). Whether sufficient corroboration exists is for the jury to determine. *Shaw*, 37 S.W.3d at 903; *Anderson*, 985 S.W.2d at 16.

Mr. Perry does not argue that the evidence failed to establish that "a crime has been committed" independent of Ms. Amy Hankins's testimony. Rather, he asserts that the evidence does not sufficiently corroborate Ms. Amy Hankins's testimony implicating him in the commission of the crime. However, Mr. Perry admitted to officers that he drove Mr. Lovelace and Mr. Powell to Cumberland City on the night of the victim's death and that he and his truck were in the video of the parking lot of an apartment complex located near the victim's home around the time of the victim's death. Ms. Amy Hankins testified that Mr. Lovelace and Mr. Powell hid their guns under the hood of Mr. Perry's truck, and Mr. Perry and one of the other men were shown in the video in front of the truck with the hood raised after Mr. Lovelace and Mr. Powell walked across the parking lot and got into the truck. Ms. Miller testified that during the summer of 2016, she overheard a telephone conversation between Mr. Perry and Mr. Powell after which Mr. Perry told her that Mr. Powell asked him to drive Mr. Powell to commit a robbery. A few days later, Mr. Perry left his and Mr. Miller's apartment, did not return until the following morning, and appeared shaken upon his return. We conclude that this evidence sufficiently corroborates Ms. Amy Hankins's testimony regarding Mr. Perry's role in the offenses.

## B. Elements of the Offenses

At trial, the State proceeded on a theory of criminal responsibility, and the trial court instructed the jury on criminal responsibility for the conduct of another. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2). While not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). However, to be convicted, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386

- 18 -

(citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

When viewed in the light most favorable to the State, the evidence presented at trial established that Ms. Ashley Hankins persuaded Mr. Lovelace and Mr. Powell to enter the victim's home and commit a burglary, robbery, and theft. Mr. Powell contacted Mr. Perry and requested that Mr. Perry drive him to a location to commit a robbery. Ms. Amy Hankins testified that on the night of the victim's death, Mr. Perry and Mr. Powell followed her and Mr. Lovelace to their home in Mr. Perry's truck. Upon arriving, Mr. Lovelace, Mr. Powell, and Mr. Perry began preparing to commit the robbery. Mr. Lovelace changed into dark clothing, and Mr. Lovelace and Mr. Powell hid their guns under the hood of Mr. Perry's truck. Mr. Perry drove Mr. Lovelace and Mr. Powell to Cumberland City where Mr. Lovelace and Mr. Powell entered the victim's home while Mr. Perry waited in his truck in the parking lot of a nearby apartment complex. The video recording of the parking lot showed Mr. Perry and one of the other men outside of Mr. Perry's truck with the hood raised, and a reasonable jury could infer that they were hiding the guns. Although Mr. Perry told officers that he did not know that a robbery was to occur, that he believed they were going to the location to purchase marijuana, and that his hood was raised because he was checking the oil, the jury, by convicting Mr. Perry of felony murder, determined that Mr. Perry's claims were not credible and instead chose to credit the testimony of Ms. Amy Hankins and Ms. Miller, which was well within the jury's purview.

We conclude that this evidence is sufficient to establish that Mr. Perry knew that Mr. Lovelace and Mr. Powell intended to enter the victim's home in order to take drugs and cash from him and that Mr. Perry agreed to drive Mr. Lovelace and Mr. Powell to the victim's home in order to commit the aggravated burglary, robbery, and theft. During the commission of the offenses, the victim was shot and killed. We hold that the evidence is sufficient to support Mr. Perry's felony murder convictions on the basis of criminal responsibility for the conduct of another.

### III. Continuances

Ms. Ashley Hankins asserts that the trial court erred in continuing the trial scheduled for May 2018 when counsel for Ms. Amy Hankins, who, at that time, was to be tried along with the Defendants, had to withdraw due to a conflict of interest. Ms. Ashley Hankins maintains that the trial court, instead, should have severed Ms. Amy Hankins's trial and allowed the Defendants' trial to proceed. Ms. Ashley Hankins also asserts that the trial court erred in denying her request to continue the trial scheduled for September 2018, alleging that additional time was needed to adequately investigate and prepare a defense after the State disclosed Ms. Amy Hankins's cooperation. The State responds

that the trial court properly exercised its discretion in granting and denying requests for continuances. We agree with the State.

The granting of a continuance rests within the sound discretion of the trial court. *Odom*, 137 S.W.3d at 589. This court will reverse the trial court's denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995). To show prejudice, the defendant must establish that a different result might reasonably have been reached if the trial court had granted the continuance or that the trial court's failure to grant the continuance denied the defendant a fair trial. *Id.* Although a continuance may be appropriate in order to afford a defendant a "reasonable opportunity" to locate a witness, the defendant has the burden of showing that a continuance might have reasonably resulted in locating the witness. *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991).

An indictment and superseding indictments were returned against the Defendants and their co-defendants in May, September, and November of 2017. The trial was scheduled to begin on October 30, 2017. The Defendants and other co-defendants filed motions to continue the trial due to the voluminous amount of discovery provided by the State. During the hearing, the trial court granted the continuance, noting that, at that time, no trials had been severed. The trial court reset the trial to begin on May 17, 2018.

At some point prior to April of 2018, the trials of Mr. Lovelace and Mr. Powell were severed from the trials of the remaining defendants. On April 3rd, Ms. Ashley Hankins filed a motion to exclude evidence of prior bad acts pursuant to Tennessee Rule of Evidence 404(b). The State filed a motion to continue the hearing on the motion, asserting that the evidence to be presented during the hearing related to both Ms. Ashley Hankins and Ms. Amy Hankins and that counsel for Ms. Amy Hankins filed a motion to withdraw. The State requested that the hearing be continued until after Ms. Amy Hankins was appointed new counsel.

During a hearing on April 20th, the trial court granted the request of counsel for Ms. Amy Hankins to withdraw due to a conflict of interest, and the trial court appointed new counsel to represent her. The trial court stated that it would need to continue the trial because the court would not require Ms. Amy Hankins to proceed to trial with an attorney who had been representing her for only a few weeks. The trial court continued the trial until September 24, 2018.

Counsel for Ms. Ashley Hankins requested an opportunity to file a motion for severance based upon speedy trial issues. The trial court allowed counsel the opportunity to file a motion. The trial court explained:

I'm not trying to prejudice any of [the defendants]. That's the reason I'm setting a new trial date four months down the road. So while that is a delay, in my opinion, it's not an extraordinary delay. If it had to have been moved to 2019, then I could understand that would be a delay that would create some problems.

But I am not foreclosing you from filing a Motion to Sever. Right now, all I have is that the three of [the defendants] are still consolidated, and for that reason, they are all three being moved to that date in September. You file whatever you feel like is in the benefit of your client, and I will schedule a hearing.

On May 3rd, Ms. Ashley Hankins filed a "Motion for Speedy Trial," in which she noted that she had been incarcerated for more than one year and asserted her right to a speedy trial. The trial court's written order denying the motion reflects that a hearing was held on May 31, 2018. However, a transcript of the hearing is not included in the appellate record. The trial court denied the motion, stating that no trial dates were available until the September 24th trial date.

Ms. Ashley Hankins asserts that the trial court erred in continuing her trial and, instead, should have severed her trial from the trial of Ms. Amy Hankins so that Ms. Ashley Hankins's trial could have proceeded in May as scheduled. However, Ms. Ashley Hankins never sought to sever her trial and did not file a severance motion when given the opportunity to do so. The trial court continued the trial for four months after Ms. Amy Hankins's attorney withdrew due to a conflict of interest and new counsel was appointed. We conclude that the trial court did not abuse its discretion in granting this short continuance.

Ms. Ashley Hankins also appears to challenge the trial court's order denying her speedy trial motion. However, a transcript of the May 31st hearing during which the motion was addressed was not included in the appellate record. The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where ... the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing *State v. Groseclose*, 615 S.W.2d 142, 147 (Tenn. 1981); *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). We note that the transcript is particularly important in light of the trial court's statement to Ms. Ashley Hankins's counsel during a subsequent hearing that "you indicated at that time on

the record that as long as the case could be guaranteed to go forward on that day that that was sufficient compliance with your client's request for a speedy trial." Accordingly, Ms. Ashley Hankins is not entitled to relief on this issue.

Finally, Ms. Ashley Hankins challenges the trial court's denial of her motion to continue the September 24th trial. Her counsel filed a motion on September 7th, stating that the State sent him an email on August 31st advising him that Ms. Amy Hankins would be testifying for the prosecution, that counsel did not read the email until September 4th, that counsel had another upcoming trial in which to prepare, and that additional time was necessary to prepare a defense and an effective cross-examination of Ms. Amy Hankins. During the hearing, Ms. Ashley Hankins's counsel stated that he recently received a letter from Ms. Candice Butler, an inmate at the local jail who stated that Ms. Amy Hankins told her that she would say anything necessary to keep her deal in place. Counsel stated that he believed some evidence, which would have been inadmissible in a joint trial, would be admissible as a result of Ms. Amy Hankins's testifying for the State. Counsel maintained that additional time was necessary in order to interview Ms. Butler, investigate Ms. Amy Hankins's statement about another unknown individual, and obtain the transcripts of Ms. Amy Hankins's prior interviews with officers. The State opposed the continuance, arguing that counsel was provided with Ms. Amy Hankins's proffered statement on August 31st, which was three weeks prior to trial and the deadline imposed by the trial court to provide its witness list of the defense. Mr. Perry's counsel stated that although he did not oppose the continuance, Mr. Perry asked for the trial to move forward as scheduled.

The trial court denied the continuance request, noting that Ms. Ashley Hankins previously filed a speedy trial motion and that the court had assured her at a prior hearing that the trial would commence on September 24th. The trial court stated that Ms. Butler was available for counsel to interview at the jail and could be subpoenaed to testify at trial. The trial court observed that in criminal cases with multiple defendants, one of the defendants routinely settles his or her case and becomes a potential witness for the State. The trial court found that Ms. Amy Hankins's agreement to cooperate with the State was not "so out of the ordinary" as to necessitate a continuance.

Ms. Ashley Hankins failed to establish that the trial court abused its discretion in denying her request for a continuance. The case had been pending for more than one year. The State provided counsel with notice of Ms. Amy Hankins's cooperation three weeks prior to trial and by the deadline imposed by the trial court for release of the State's witness list. Counsel for Ms. Ashley Hankins extensively questioned Ms. Amy Hankins on cross-examination at trial regarding her prior statements to officers in which she claimed no knowledge of the offenses. Counsel also presented the testimony of Ms. Butler regarding Ms. Amy Hankins's comments to her. Ms. Ashley Hankins failed to

present any additional proof that could have been obtained had the trial court granted a continuance. Therefore, she is not entitled to relief regarding this issue.

## IV. The Admission of Evidence of Other Bad Acts

Ms. Ashley Hankins maintains that the trial court erred in admitting evidence of other bad acts pursuant to Tennessee Rule of Evidence 404(b). She specifically challenges testimony of her solicitation of others to commit a robbery, of her prior drug use, and of her trading or selling a firearm following the victim's death. The State responds that Ms. Ashley Hankins waived her claims regarding evidence of her drug use and the trading or selling of a firearm by failing to challenge the evidence in the trial court. The State also responds that the trial court properly admitted the testimony and that any error is harmless.

## A. Proceedings in the Trial Court

Prior to trial, Ms. Ashley Hankins filed a motion seeking to exclude evidence of prior bad acts pursuant to Tennessee Rule of Evidence 404(b). She specifically sought to exclude evidence that she previously solicited others to commit a robbery.

During a pretrial hearing, the State presented the testimony of Ms. Blake, who stated that in March or April of 2016, while at her home, Ms. Ashley Hankins asked Mr. Blake if he wanted to rob someone and make money. Ms. Blake testified that Ms. Ashley Hankins identified the person to be robbed as "Donnie" and stated that the robbery would be easy due to the location of his home in Cumberland City. Ms. Ashley Hankins told Mr. Blake that "Donnie" would have a gun and that Mr. Blake would need a gun too. Ms. Blake stated that she stopped the conversation and told Ms. Ashley Hankins that she should not ask Mr. Blake to commit the robbery and that Ms. Ashley Hankins should commit the robbery herself. Ms. Blake acknowledged on cross-examination that she did not provide a statement to the police until 2017, after the defendants had been arrested. She explained on redirect examination that she did not feel that she could safely speak to officers until after the defendants' arrests.

The transcript of the parties' arguments following Ms. Blake's testimony and any oral findings by the trial court are not included in the appellate record. The trial court entered a written order, finding that Ms. Blake was a credible witness and that the conversation was established by clear and convincing evidence. The trial court also found that the evidence was relevant to establish intent and a common scheme or plan and that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

During a hearing at trial outside the presence of the jury, Ms. Bell testified that she had known Ms. Ashley Hankins since 2010 or 2011 and that they were doing drugs together in 2016. Ms. Bell stated that Ms. Ashley Hankins initially asked Ms. Bell's husband and his friend to rob the victim. Once Ms. Bell learned of the conversation, Ms. Ashley Hankins asked Ms. Bell to participate, and Ms. Bell refused. Ms. Bell testified that sometime after the victim's death, Ms. Ashley Hankins offered to trade her a black and gray handgun for drugs. When Ms. Bell declined, Ms. Ashley Hankins traded the gun at Mr. Greg Brown's home. On cross-examination, Ms. Bell testified that Ms. Ashley Hankins solicited her to commit the robbery two or three days before the victim's death.

The trial court found that evidence that Ms. Ashley Hankins solicited others to commit a robbery of the actual victim was admissible because it went "hand-in-hand with the State's theory about this case and the criminal responsibility that the State alleges Ms. Hankins bears." The trial court stated that it was not defining the solicitation as a "prior bad act" but as part of the State's evidence of a common scene or plan. The trial court explained that "it's not just a prior bad act but rather a part of the scheme, the crime that the State is alleging took place, and the planning and executing of a common scheme or plant is the theory of why the State is introducing this, and I find that to be a credible argument." The trial court further stated that even if the evidence constituted a prior bad act, the evidence was "a part of the planning that took place in this case." The trial court concluded that the evidence was relevant and, although cumulative, the probative value of the evidence outweighed any prejudice.

At the conclusion of the presentation of the proof, the trial court instructed the jury that if the jury determined that any of the Defendants committed a crime or crimes other than those for which they were on trial, such evidence could not be used to determine the Defendants' disposition to commit the crimes for which they were on trial. The trial court instructed the jury that evidence of other crimes could only be considered to complete the story or as proof of the Defendants' identities, a scheme or plan, motive, intent, or guilty knowledge.

## B. Analysis

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Rule 404(b) has been described as a rule of exclusion rather than inclusion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). "Trial courts have been encouraged to take a 'restrictive approach of [Rule] 404(b) ... because "other act" evidence carries a significant potential for unfairly influencing a jury.'" *Id*. (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)).

Evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme," or contextual background. *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Evidence may be admitted for these purposes if the following requirements have been met:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If the trial court has substantially complied with the procedure mandated by Rule 404(b), a trial court's decision to admit or exclude evidence pursuant to Rule 404(b) is reviewed under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion when "'it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party.'" *Jones*, 450 S.W.3d at 892 (quoting *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013)). If the trial court has failed to substantially comply with the procedural mandates of Rule 404(b), our standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-53).

With regard to the evidence of Ms. Ashley Hankins's solicitation of Mr. Blake, the trial court held a pretrial hearing after which the trial court found that the solicitation was established by clear and convincing evidence, that the evidence was relevant on the issues of intent and a common scheme or plan, and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Because the trial court substantially complied with the procedure set forth in Rule 404(b), our standard of review is abuse of discretion. However, the trial court made no finding that Ms. Ashley Hankins's solicitation of Ms. Bell and her husband was established by clear and convincing evidence before admitting the testimony. Because the trial court did not substantially

comply with the procedure in Rule 404(b) before admitting this evidence, our standard of review is de novo. *See State v. Benjamin Foust*, No. E2017-02420-CCA-R3-CD, 2019 WL 3824028, at *16 (Tenn. Crim. App. Aug. 15, 2019) (reviewing the admission of evidence under Rule 404(b) do novo when the trial court did not make explicit findings that the evidence supporting the bad acts was clear and convincing or that the danger of unfair prejudice did not outweigh the probative value of the evidence), *no perm. app. filed*.

As found by the trial court, Ms. Ashley Hankins's prior solicitations of others were relevant evidence of a common scheme or plan. To constitute a common scheme or plan, the offenses must either be: "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *State v. Shirley*, 6 S.W.3d 243, 248 (Tenn. 1999). The trial court found that the solicitations were part of a larger, continuing plan.

When offenses are alleged to be part of a larger, continuing plan or conspiracy, the prosecution must present proof of "'a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" *State v. Prentice*, 113 S.W.3d 326, 331 (Tenn. Crim. App. 2001) (quoting *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer v. State*, 12 S.W.3d 438, 447 n.12 (Tenn. 2000)). "[A] larger, continuing plan or conspiracy 'involves not the similarity between the crimes, but [rather] the common goal or purpose at which they are directed.'" *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting *Hoyt*, 928 S.W.2d at 943); *see State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). The offenses may not be simply a string of similar crimes, but must be committed "in furtherance of a plan that has a readily distinguishable goal." *Denton*, 149 S.W.3d at 15.

Ms. Ashley Hankins's prior solicitations of others were part of a continuing plan to have someone rob the victim of his drugs and money. *See State v. Chivous Sirrel Robinson*, No. E2001-00865-CCA-R3-CD, 2003 WL 649115, at *3-4 (Tenn. Crim. App. Feb. 28, 2003) (concluding that the defendant's prior solicitation of a witness to kill his wife was admissible as proof of a common scheme or plan). Although Ms. Blake testified at trial that Ms. Ashley Hankins did not specify the individual whom she wanted robbed, Ms. Blake provided sufficient detail to allow a reasonable person to infer that the victim was the intended target. Ms. Bell testified that Ms. Ashley Hankins made the solicitation within a day of the victim's death and identified the victim as the target. By admitting the evidence, the trial court implicitly credited this testimony. Evidence of the prior solicitations also were relevant to the issue of intent and the State's theory of criminal responsibility. The probative value of the evidence was great, especially in light

of Ms. Ashley Hankins's defense at trial that she was not involved in the home invasion and the victim's death. The probative value of the evidence was not outweighed by the danger of unfair prejudice. We conclude that the trial court properly admitted the evidence.

Ms. Ashley Hankins also challenges the admission of Ms. Bell's testimony regarding Ms. Ashley Hankins's prior drug use and her attempts to trade a gun for drugs following the victim's death. However, Ms. Ashley Hankins did not challenge this evidence pursuant to Rule 404(b) in the trial court. Accordingly, this issue is waived. *See State v. Gordon Scot Katz*, No. E2017-02516-CCA-R3-CD, 2018 WL 4697267, at *5 (Tenn. Crim. App. Oct. 1, 2018); *State v. Benjamin Gunn*, No. W2016-00338-CCA-R3-CD, 2017 WL 4861664, at *12 (Tenn. Crim. App. Oct. 26, 2017); *see also State v. Jones*, 151 S.W.3d 494, 498 n.3 (Tenn. 2004) (declining to consider whether evidence should have been excluded under Rule 404(b) when the defendant did not request a 404(b) hearing in the trial court).

## V. Limitation of Cross-Examination of a Witness

Ms. Ashley Hankins maintains that the trial court erred in limiting her counsel's cross-examination of Ms. Bell. The State responds that the trial court properly limited counsel in cross-examining Ms. Bell on an issue of "marginal relevance."

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000); *State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992) *superseded by statute as stated in State v. Reid*, 91 S.W.3d 247, 306 n.13 (Tenn. 2002). "'[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015) (quoting *United States v. Owens*, 484 U.S. 554, 559 (1988)). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *see State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997) (stating that a defendant's right to confront and cross-examine witnesses "does not mean that a defendant has a right to present irrelevant evidence"). "The propriety, scope, manner and control of the cross-examination of witnesses … rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). This court will not disturb the limits that a trial court has placed upon cross-examination unless the trial court has unreasonably restricted the right. *Id.*

In cross-examining Ms. Bell at trial, Ms. Ashley Hankins's counsel questioned her about her posts on Facebook regarding Ms. Sharon Hopkins, who had no apparent relation to the offenses on trial. In response to the questioning, Ms. Bell denied making any posts in an attempt to intimidate Ms. Hopkins and denied making a post stating, "snitches get stitches." Counsel began reading from what appeared to be another post when the State objected and argued that the line of questioning was irrelevant.

During a hearing outside the jury's presence, counsel for Ms. Ashley Hankins argued that Ms. Bell's intimidation of another was character evidence that was relevant to Ms. Bell's credibility. Counsel acknowledged that Ms. Bell's Facebook posts were unrelated to the present case and that he did not know who Ms. Hopkins was. The trial court found that counsel's argument that Ms. Bell was intimidating a witness was speculative, was unrelated to the trial, and was not relevant. The trial court sustained the State's objection and instructed the jury to disregard the line of questioning.

Although Ms. Ashley Hankins contends that the trial court improperly restricted her right to cross-examine Ms. Bell, Ms. Ashley Hankins failed to make an offer of proof regarding what any additional cross-examination would have revealed. Counsel did not question Ms. Bell outside the jury's presence regarding who Ms. Hopkins was, the meaning of the posts, and the circumstances under which the posts were made. Counsel also failed to enter a print-out of the Facebook posts into the record as part of an offer of proof. The failure to make an offer of proof precludes this court from reviewing the issue. *See State v. McCaleb*, 582 S.W.3d 179, 199 (Tenn. 2019) (holding that the State's failure to make an offer of proof regarding the excluded evidence precluded the trial court from making specific findings regarding the proposed testimony and precluded the appellate court from considering the issue); *State v. Hall*, 958 S.W.2d 679, 691 n. 10 (Tenn. 1997) ("[G]enerally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded."). Accordingly, Ms. Ashley Hankins is not entitled to relief on this issue.

## VI. Exclusion of Mr. Lovelace's Statement

Ms. Ashley Hankins asserts that the trial court erred in excluding Mr. Lovelace's statement to law enforcement in which he implicated himself in the offense but never mentioned Ms. Ashley Hankins's involvement. Ms. Ashley Hankins maintains that Mr. Lovelace's statement qualified under the hearsay exception for a statement against interest. The State responds that the trial court properly exercised its discretion in excluding the statement. We agree with the State.

Counsel for Ms. Ashley Hankins asked Special Agent Adkins on cross-examination whether Mr. Lovelace had given any statements against his interest. The State objected, arguing that the response called for hearsay. During a hearing outside the jury's presence, counsel again asked Special Agent Adkins whether Mr. Lovelace made any statements against his interest, and Special Agent Adkins stated that Mr. Lovelace admitted that he was at the victim's home with Mr. Perry and Mr. Powell. Counsel asked whether Mr. Lovelace implicated Ms. Ashley Hankins in the offense, and Special Agent Adkins responded that Mr. Lovelace did not.

Counsel for Ms. Ashley Hankins agreed with the trial court that he was seeking to admit the absence of an allegation against Ms. Ashley Hankins in Mr. Lovelace's statement. The trial court sustained the State's objection. The trial court found that Mr. Lovelace's statement implicating himself in the offense did not "make more or less true [Ms. Ashley Hankins's] guilt or innocence on the charge." The trial court also found Mr. Lovelace's failure to mention Ms. Ashley Hankins as participating in the offense was not a statement against Mr. Lovelace's penal interest.

As part of the defense proof at trial, counsel for Ms. Ashley Hankins sought to recall Special Agent Adkins as a witness in order to question him regarding Mr. Lovelace's statement, and the State again objected. During a jury-out hearing, Special Agent Adkins testified that during the interview, Mr. Lovelace admitted to going to the victim's home and participating in the offense. Special Agent Adkins stated that Mr. Lovelace never mentioned Ms. Ashley Hankins, and Special Agent Adkins could not recall whether he asked Mr. Lovelace whether she was involved in the offense. Special Agent Adkins acknowledged that at the time, he suspected that Ms. Ashley Hankins was involved, and he agreed that it would have been important to the investigation if Mr. Lovelace admitted that Ms. Ashley Hankins asked him to rob the victim.

The trial court found that Mr. Lovelace was unavailable as a witness but that his statements were not admissible as statements against his penal interest. The trial court noted that Mr. Lovelace did not state that he committed the offense instead of Ms. Ashley Hankins. The trial court stated that the fact that Mr. Lovelace was not asked about Ms. Ashley Hankins and did not mention her did not prove that she was or was not involved in the offense and that "[i]n other words, the statement that's being sought doesn't inculpate Mr. Lovelace and exonerate [Ms. Ashley Hankins]."

In determining whether a statement is hearsay and whether the statement fits within one of the hearsay exceptions, the trial court may make factual findings and credibility determinations in ruling on an evidentiary motion, and "these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015)

(citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)).  "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review."  *Id.* (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  Generally, hearsay is not admissible unless the statement falls within one of the exceptions provided by the rules of evidence or otherwise by law.  Tenn. R. Evid. 802.  When a declarant is unavailable as a witness, the hearsay rule does not exclude "a statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability … that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."  Tenn. R. Evid. 804(b)(3).  Each specific assertion must be examined individually in determining whether the statements in an accomplice's confession were against his or her interests.  *See State v. Dotson*, 254 S.W.3d 378, 392-93 (Tenn. 2008).

In *Dotson*, the Tennessee Supreme Court concluded that the trial court properly determined that an accomplice's confession to a robbery did not qualify under the hearsay exception as statements against his penal interest.  *Id.*  The court reasoned, in part, that while the accomplice's confession was clearly against his penal interest, "the statement did not tend to exculpate the [d]efendant for the robbery."  *Id.* at 393.  The court observed that "'the most frequent application of [Rule 804(b)(3)] in criminal cases is the tender of hearsay evidence that an unavailable declarant had confessed to the witness that declarant, not defendant, committed the crime that is the subject of the prosecution.'"  *Id.* (quoting *Smith v. State*, 587 S.W.2d 659, 660 (Tenn. 1979)).

In the present case, the trial court determined that Mr. Lovelace, a co-defendant whose trial was pending, was unavailable to testify.  However, while Mr. Lovelace's confession was against his penal interest, the statement did not exculpate Ms. Ashley Hankins for the offense.  Mr. Lovelace did not mention Ms. Ashley Hankins, and there is no evidence that Mr. Lovelace was asked about her during the interview.  Based on the Tennessee Supreme Court's holding in *Dotson*, we cannot conclude that the trial court erred in excluding the evidence.  Furthermore, counsel was able to elicit testimony from Special Agent Adkins at trial that he never asked Mr. Perry or Mr. Lovelace about whether Ms. Ashley Hankins had a role in the commission of the offense.  This line of questioning accomplished what counsel sought to do with Mr. Lovelace's statement in that the jury essentially was told that Ms. Ashley Hankins's name was not mentioned

during the interviews of the co-defendants. Accordingly, any error in the exclusion of Mr. Lovelace's statement was harmless. *See State v. Rodriguez*, 254 S.W.3d 361, 374 (Tenn. 2008) (holding that a defendant is entitled to relief from a non-constitutional error only if it "more probably than not affected the judgment or would result in prejudice to the judicial process").

## VII. Jury Instruction on Concealment/Destruction of Evidence

Both of the Defendants contend that the trial court erred in including in its final jury instructions an instruction regarding the concealment or destruction of evidence. However, neither of the Defendants raised this issue in their respective motions for new trial and, thus, have waived the issue. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in … jury instructions granted or refused … unless the same was specifically stated in a motion for new trial…."); *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (holding that failure to object to erroneous definitions of intentionally and knowingly did not result in waiver of the issue but that the failure to include the issue in a motion for new trial did result in waiver).

## VIII. Closing Arguments

Mr. Perry asserts that the prosecutor made multiple improper comments during rebuttal closing arguments. "Closing arguments serve 'to sharpen and to clarify the issues that must be resolved in a criminal case'" and enable "'the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury.'" *State v. Hawkins*, 519 S.W.3d 1, 47 (Tenn. 2017) (quoting *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)). Because counsel in criminal cases are "'expected to be zealous advocates,'" they are afforded "'great latitude in both the style and the substance of their arguments.'" *Id*. (quoting *Banks*, 271 S.W.3d at 130-31). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id*. at 47-48 (quoting *Banks*, 271 S.W.3d at 131). Accordingly, "a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id*. (citations omitted). Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3)

inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id*. The following factors should be considered when making this determination:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6.

Mr. Perry contends that the prosecutor made numerous comments during rebuttal closing arguments that were designed to flame the jury, disparage defense counsel and the Defendants, express the prosecutor's personal beliefs and opinions as to the truth and falsity of the testimony presented at trial, inject issues broader than the guilt or innocence of the Defendants, reference matters outside the record, misstated the evidence, and reference Mr. Perry's exercise of his constitutional right to remain silent and to not testify. Mr. Perry acknowledges that he did not object to the prosecutor's comments at trial, which generally results in waiver of the issue on appeal. *See* Tenn. R. App. P. 36(a); *State v. Fusco*, 404 S.W.3d 504, 519 (Tenn. Crim. App. 2012). However, he requests review under the plain error doctrine.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a

substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

Mr. Perry challenges the following comments made by the prosecutor during rebuttal closing arguments:

■ Because all you have heard really from the Defense the last few days in their questioning of the witnesses are reasons to not think about the murder of Donnie Cooksey. Everything they have done, the questions they have asked, the interviews they have given is designed with one thing, to distract you from what we all know absolutely, beyond any doubt happened, which was the cold blooded murder of a man inside his home in the middle of the night. That should resonate more than anything else in your deliberations is that a man in Stewart County was murdered in cold blood. That's an absolute, rock solid truth that all of the other B.S. should bring to the front.

■ The prosecutor's use of the Watergate scandal as an example of criminal responsibility.

■ So yes, it's a dirty deal that sometimes has to be made, and I made it. And I had to look at that family right there, and they looked at me, knowing that Amy Hankins could be called upon to testify and begin an eight year sentence. We know who are responsible, the family and the State of Tennessee, and for [defense counsel for Ms. Ashley Hankins] to sit up there and make up some crap about us intimidating another witness, going to meet Ms. Hankins, that's untrue. That's a decision made between myself and the family. The family of Donnie Cooksey. The people that matter. [Defense counsel for Ms. Ashley Hankins] doesn't matter. His thoughts on Donnie Cooksey don't matter to me.

Only these people out here. And if they're good with me offering Amy Hankins a deal, then so be it.

■ There are several things that Ms. Hankins, Mr. Powell, Mr. Lovelace all have in common, and Amy Hankins. And Amy Hankins. All of them are liars. All of them. Not a one of them ain't a liar. Now it's up to you to decide which one is the most truthful. Which one is the most truthful. Well, you heard Amy Hankins sit up here today and acknowledge that she was a liar. At least she did that. When cross-examined she acknowledged that she had lied on multiple occasions to these investigators.

■ But [Mr. Perry] wants you to believe that he was putting oil in his truck. And the man sitting next to him on the first day of the trial, [Mr. Cox, Mr. Perry's co-counsel,] had the audacity to refer to us as silver tongued devils. And this guy is telling you he is putting oil in this truck. Bought three grams of marijuana. And if Mr. Cox were here I would tell him that that story smells like his heifer farm. Like cow poo. Silver tongued devils. They're the ones lying.

■ I had Agent Adkins weigh these things. This is three packs of Sweet and Low. They weigh combined 3.8 grams. Grams. This cookie, 17 grams. Mr. Perry, because he was so desperate for marijuana, drove from Clarksville, a city of 100,000 people, more than that, to Cumberland City to buy less than this. His own statement, and you can listen to it, I encourage you to, he says three grams of marijuana, at two o'clock in the morning. Yes, right, but we're silver tongued devils. Three grams of marijuana. That's 17 grams right there.

■ There's the truck parked, he gets out. Puts the hood up. Now, you have also seen the other camera angle of the two other gentlemen who are alongside the truck at the same time. If you compare the time stamps as he is getting out, one of them goes up to the front of the truck, too. I even asked Agent Adkins about it. It appears, based on Perry's statement that two people would be adding oil. That is a lie. It's a very thin foundation that he is lying about. All of his lies have crumbled.

■ He also tells you and wants you to believe that he doesn't know D's name. Abdullah Powell. But we know because Agent Adkins testified they have known each other since middle school. Another thing that all of these people have in common if you notice is that none of them know

- 34 -

anybody's last name. They can't remember, they don't know, they don't know where they live. That's because they're all liars. And they're all lying to you.

■ They want you to forget about this. They're all pill heads. How many times did you hear in these interviews of—Amy Hankins testified that she is a pill addict. She said in her statement that she is a pill addict. She said in her statement that she is a pill addict.

■ Don't you think it's strange that if he really was going to go to Cumberland City from Clarksville to buy three grams of weed, an Oreo cookie, less than an Oreo cookie weighs, that he would have stayed in the truck. You listen to his interview. Why didn't he get out of the truck. I guess the guy didn't want you to see his face.

■ I'm almost finished. And I know your time is valuable. The biggest thing to me that stands out, both defendants in this case today and throughout this entire trial is that neither one of them have shown an ounce or a gram of remorse at all. At all. Don't care at all. You heard at least two witnesses testify that she killed him and wanted him—not killed him, but wanted him killed because he was greedy and she was jealous. And then didn't care that he was dead after the fact. Neither one have ever shown any remorse at all.

■ …[Mr. Perry's counsel] was disclosing, said he has got an old truck. And I do, too. A 1997 Chevrolet with 256,000 miles on it, a Tahoe. It takes oil.

Now, Ladies and Gentlemen, this case does turn on credibility. And if you believe that he got out of that truck at two o'clock in the morning to add oil, if you believe that, I know what you are going to do in the jury room. But if you don't believe that he brought oil then you need to convict him. If you don't believe that he put oil in that truck then he's convicted. Because what he was doing was getting under that hood and getting a weapon out for a homicide that had not yet occurred, but did shortly after he opened the hood.

We note that some of the prosecutor's comments regarding defense counsel and their trial tactics were in response to the Defendants' closing arguments during which Ms. Ashley Hankins's counsel suggested that the State suborned perjury by presenting Ms. Amy Hankins's testimony and Mr. Perry's counsel vouched for Special Agent Adkins's

testimony regarding Mr. Perry's lack of involvement. Although the prosecution "is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial," *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007) (citations omitted), this court has held that a prosecutor's comments during rebuttal closing argument reflecting unfavorably on defense counsel and the defense's trial tactics were not error when the comments were in response to statements made by defense counsel during closing arguments, *see, e.g. State v. Brandon Robert Vandenburg*, No. M2017-01882-CCA-R3-CD, 2019 WL 3720892, at *52-53 (Tenn. Crim. App. Aug. 8, 2019), *perm. app. denied* (Tenn. Jan. 15, 2020) (concluding that the prosecutor's comments during rebuttal argument addressing the defense's arguments as "red herrings" did not breach a clear and unequivocal rule of law to rise to the level of plain error when the comments were in response to defense counsel's statements during closing arguments); *State v. Lance Burton*, No. W2009-01875-CCA-R3-CD, 2010 WL 3244949, at *5 (Tenn. Crim. App. Aug. 17, 2010) (addressing the prosecutor's comments referencing the defense's arguments as "defense attorney tricks, defense attorney strategy"). In light of the holdings in *Brandon Robert Vandenburg* and *Lance Burton*, we cannot conclude that these comments by the prosecutor breached a clear and unequivocal rule of law as to rise to the level of plain error.

The majority of the prosecutor's comments regarding the terms of Ms. Amy Hankins's plea deal and the prosecutor's role in procuring the deal and the prosecutor's arguments regarding Mr. Perry's claims that he believed he was going to purchase a small amount of marijuana and that he lifted the hood of his truck in order to check the oil and/or put oil in the truck were based on the evidence presented at trial or were reasonable inferences to be drawn from the evidence. However, the prosecutor improperly referred to matters outside the record when he discussed the role of the victim's family in Ms. Amy Hankins's plea deal and their acquiescence of the plea deal, the weight of three packets of Sweet-n-Low, and the weight of an Oreo cookie, and when he referred to Mr. Lovelace and Mr. Powell as "liars" when neither of them testified at trial and their statements were not introduced into evidence. *See Goltz*, 111 S.W.3d at 6 (prohibiting a prosecutor from arguing or referring to facts outside the record unless the facts are matters of common knowledge). The prosecutor also improperly provided his personal opinion regarding the credibility of witnesses and Mr. Perry's guilt or innocence by referring to the Defendants and the co-defendants as "liars" and by stating that Mr. Perry's claims are "lies" and that his claim of putting oil in his truck "smells like [co-counsel's] heifer farm. Like cow poo."

Mr. Perry also maintains that at some point, the prosecutor used a bottle of motor oil as a demonstrative aid and walked over to the defense table where Mr. Perry was sitting and set down the bottle. Because defense counsel did not object, the transcript of the closing argument does not include any reference to the prosecutor's actions. Mr.

Perry raised the issue in his motion for new trial, and during the hearing on the motion, Mr. Perry's counsel stated that "the State walked over to our table and placed down a bottle of motor oil." Defense counsel argued that the prosecutor's conduct was improper because the bottle of motor oil was not entered as an exhibit at trial and the use of motor oil was never referenced at trial. The State responded that the use of demonstrative aids during closing arguments was appropriate and that Mr. Perry had stated that he raised the hood of his truck in order to check the oil and add oil. In denying Mr. Perry's motion for new trial, the trial court noted that the State's position at trial was that had Mr. Perry raised the hood of his truck in order to add oil as he claimed, he would have been seen carrying the bottle in his hand. The trial court noted that the defense failed to make a contemporaneous objection and that while "[p]utting it on the table of the Defense might not have been necessarily called for, but I don't think it rose to the level of inflaming the passions of the Jury."

The introduction of demonstrative evidence is permissible not only during trial but also during closing arguments, so long as the demonstrative evidence is based on the proof introduced at trial. *See, e.g., Hawkins*, 519 S.W.3d at 50 (concluding that the prosecutor's use of a saw similar to that used by the defendant during rebuttal closing argument to demonstrate how the defendant dismembered the victim did not breach a clear rule of law as to constitute plain error); *State v. Travis Seiber*, No. W2015-00221-CCA-R3-CD, 2016 WL 716307, at *5 (Tenn. Crim. App. Feb. 23, 2016) (holding that the trial court did not abuse its discretion in allowing the prosecutor to use a plastic handgun as a demonstrative aid to demonstrate distance during closing argument). At one point, Mr. Perry told officers that he raised the hood of his truck, checked the oil, and added more oil. The trial court found that the State used the bottle of motor oil in order to argue that had Mr. Perry added oil to his truck as he claimed, he would have been seen holding the bottle of motor oil in the video. We agree with the trial court that the prosecutor's placing the bottle of motor oil was not necessary. However, given the limited record regarding the use of the demonstrative aid as a result of Mr. Perry's failure to object, we cannot conclude that the prosecutor breached a clear and unequivocal rule of law.

Furthermore, we conclude that Mr. Perry is not entitled to relief based upon any impropriety by the prosecutor in using the bottle of motor oil and the prosecutor's improper comments. Reversal under the plain error doctrine for improper closing argument is warranted "only in exceptional circumstances." *Banks*, 271 S.W.3d at 132 n.30 (citing *United States v. Smith*, 508 F.3d 861, 864 (8th Cir. 2007). "'[F]leeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers.'" *Id.* (quoting *United States v. Mullins*, 446 F.3d 750, 758 (8th Cir. 2006)).

The evidence supporting the convictions was strong and included the testimony of a co-defendant and Mr. Perry's former girlfriend, as well as a video recording of Mr. Perry near the victim's home at the time of the offense. Mr. Perry acknowledged to officers that he drove Mr. Lovelace and Mr. Powell to the area but maintained that he believed the two men only intended to purchase a small amount of marijuana. However, Mr. Perry lied to officers regarding his knowledge of Mr. Powell and attempted to extort money from the officers in exchange for information regarding the offense. Although Mr. Perry did not object to the prosecutor's comments, the trial court instructed the jury in response to objections made by the prosecutor during the defense's closing arguments that counsel's statements are not evidence and that the jury should reach a decision based upon the evidence presented at trial. Accordingly, we conclude that the prosecutor's improper comments did not impact the jury's verdict or otherwise adversely affect a substantial right of Mr. Perry and that consideration of the error is not necessary to do substantial justice. *See Smith*, 24 S.W.3d at 282.

We note that although Mr. Perry did not object to the prosecutor's use of a bottle of motor oil as a demonstrative aid or the prosecutor's statements that Mr. Perry's claim smelled like "cow poo," Mr. Perry raised the issues in his motion for new trial. Our supreme court has applied plenary review rather than plain error review to allegations of prosecutorial misconduct during closing arguments that were raised in a motion for new trial even though the defendant failed to contemporaneously object at trial. *See Hawkins*, 519 S.W.3d at 8. However, our supreme court recently granted permission to appeal in a case on the issue of whether plenary review or plain error review should apply to a claim of prosecutorial misconduct during closing arguments when the defendant failed to make a contemporaneous objection but raised the issue in a motion for new trial. *See State v. Edward Walsh*, No. M2019-00989-SC-R11-CD (Tenn. Jan. 15, 2021) (order). Even if we apply plenary review to the two claims raised by Mr. Perry in his motion for new trial, Mr. Perry is not entitled to relief because the prosecutor's comments and use of the bottle of motor oil were not so inflammatory or improper that they affected the outcome of the trial to Mr. Perry's detriment. *See Banks*, 271 S.W.3d at 131.

Finally, Mr. Perry asserts that the prosecutor improperly commented on the exercise of his constitutional right to remain silent and not testify at trial by stating:

> I'm almost finished. I know your time if valuable. This biggest thing to me that stands out, both defendants in this case today and throughout this entire trial is that neither one of them have shown an ounce or a gram of remorse at all. At all. Don't care at all. You heard at least two witnesses testify that she killed him and wanted him—not killed him, but wanted him killed because he was greedy and she was jealous. And

then didn't care that he was dead after the fact. Neither one of them have ever shown any remorse at all.

Because Mr. Perry failed to object to these comments at trial and did not raise the issue in his motion for new trial, our review is limited to plain error.

Both the United States Constitution and the Tennessee Constitution "guarantee criminal defendants the right to remain silent and the right not to testify at trial." *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014). This right prohibits a prosecutor from commenting on a defendant's decision not to testify at trial. *See Griffin v. California*, 380 U.S. 609, 614-15 (1965); *Jackson*, 444 S.W.3d at 585-86. Moreover, "'indirect references on the failure to testify also can violate the Fifth Amendment privilege.'" *Jackson*, 444 S.W.3d at 587 (quoting *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000), *superseded by statute on other grounds as stated in Stewart v. Winn,* 967 F.3d 534, 540 (6th Cir. 2020)). Our supreme court has adopted a two-part test for determining whether a prosecutor's remark constitutes an improper comment on a defendant's constitutional right to remain silent and not testify. *Id.* at 587-88. The reviewing court must consider "(1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." *Id.* at 588.

When viewed in the context in which the remarks were made, we cannot conclude that the prosecutor's manifest intent was to comment on Mr. Perry's right not to testify or that the jury would necessarily have taken the remarks to be a comment on Mr. Perry's failure to testify. In making the argument, the prosecutor focused on Ms. Ashley Hankins and the witnesses who testified that she was not upset that the victim was killed. Although Mr. Perry did not testify at trial, a recording of his interview with law enforcement was played, and during the interview, Mr. Perry sought compensation for information regarding the victim's death. The jury could reasonably view Mr. Perry's actions as showing a lack of remorse. Accordingly, the prosecutor's remarks did not violate a clear and unequivocal rule of law, and Mr. Perry has failed to establish that the prosecutor's remarks constituted plain error.

### IX. Cumulative Error

Mr. Perry seeks relief based upon cumulative error. However, Mr. Perry has failed to establish any error entitling him to relief when considered either individually or cumulatively.

**CONCLUSION**

Based on the foregoing, we affirm the judgments of the trial court. However, it appears from the record that the trial court failed to properly merge the Defendants' three convictions for felony murder into a single conviction. *See State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015) ("Merger ... is required when a jury returns guilty verdicts on two counts that represent alternative theories of the same offense."). Accordingly, we remand for entry of amended judgments reflecting that the Defendants' separate felony murder convictions are merged into a single felony murder conviction for each of the Defendants.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE